US DISTRICT COURT
WESTERN DIST ARKANSAS
FILED

OCT 3 1 2016

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETVILLE DIVISION**

DOUGLAS F. YOUNG, Clerk
By
Deputy Clerk

|  |  |
|---|---|
| WAL-MART STORES, INC., <br> WAL-MART STORES EAST, LLC, <br> WAL-MART STORES EAST, LP, <br> WAL-MART STORES TEXAS, LLC, <br> SAM'S WEST, INC., and <br> SAM'S EAST, INC, <br><br>         Plaintiffs, <br><br> vs. <br><br> BUMBLE BEE FOODS LLC, <br> DEL MONTE FOODS COMPANY, <br> TRI-UNION SEAFOODS LLC, and <br> STARKIST COMPANY, <br><br>         Defendants. | Case No. 16-5312 TLB <br><br><br><br><br> JURY TRIAL DEMANDED |

**COMPLAINT**

Plaintiffs Wal-Mart Stores, Inc., Wal-Mart Stores East, LLC (f/k/a Wal-Mart Stores East, Inc.), Wal-Mart Stores East, LP, Wal-Mart Stores Texas, LLC, Sam's West, Inc., and Sam's East, Inc., hereinafter referred to collectively as "Walmart" or "Plaintiffs," by and through their undersigned attorneys, file this complaint against Bumble Bee Foods LLC, Del Monte Foods Company, StarKist Company, and Tri-Union Seafoods LLC doing business as Chicken of the Sea International, Inc. (collectively the "Defendants") and allege, upon knowledge as to themselves and otherwise upon information and belief, as follows.

1

## NATURE OF THE ACTION

1.      This is an antitrust action arising out of a continuing conspiracy to fix, raise, inflate, maintain, or stabilize prices of packaged tuna products, among Bumble Bee Foods LLC, Tri-Union Seafoods LLC, and StarKist Company, the three largest brand name producers of packaged tuna products in the United States. The exact starting time of the conspiracy is yet to be determined but is believed to have begun no later than 2008–2010, and the conspiracy continued until at least July 2015 ("Relevant Period").

2.      Plaintiffs owned and operated retail and warehouse club stores during the Relevant Period, and Plaintiffs purchased packaged tuna directly from Defendants and their co-conspirators. As a result of Defendants' conspiracy to stabilize, inflate, fix, or maintain the prices of packaged tuna products, Defendants and their co-conspirators directly overcharged Plaintiffs, as well as Plaintiffs' subsidiaries and affiliates, for packaged tuna in direct violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## JURISDICTION AND VENUE

3.      Plaintiffs bring their claims for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to obtain injunctive relief and to recover treble damages and the costs of suit, including reasonable attorney's fees.

4.      This Court has subject matter jurisdiction over the Sherman Act claims pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

5.      Venue is proper in this District pursuant to Sections 4(a) and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b), (c) and (d), because during the Relevant

Period, one or more Defendants transacted business in, was found in, and/or had agents within this District, and a substantial part of the events giving rise to Plaintiffs' claims occurred and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.

6.      Plaintiffs' Supplier Agreements with Defendants Bumble Bee, StarKist, and Tri-Union include mandatory venue provisions requiring that any lawsuit arising under or relating to those agreements be filed in the federal or state courts of Benton and Washington County, Arkansas.

7.      This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business in this District; (b) directly or indirectly sold and delivered packaged tuna products in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy to fix prices of packaged tuna products that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

**PARTIES**

8.      Plaintiff Wal-Mart Stores, Inc. is a Delaware corporation with its headquarters in Bentonville, Arkansas. Wal-Mart Stores, Inc. is a retail corporation that operates discount grocery, department, and warehouse stores across the United States and internationally.

9.      Plaintiff Wal-Mart Stores East, LP is a Delaware limited partnership with its principal place of business in Bentonville, Arkansas.

10.     Plaintiff Wal-Mart Stores East, LLC (f/k/a/ Wal-Mart Stores East, Inc.) is an Arkansas limited liability company with its principal place of business in Bentonville, Arkansas.

11.     Plaintiff Wal-Mart Stores Texas, LLC (f/k/a/ Wal-Mart Stores Texas, LP) is a Delaware limited liability company with its principal place of business in Bentonville, Arkansas.

12.     Plaintiff Sam's West, Inc. is an Arkansas corporation with its principal place of business in Bentonville, Arkansas.

13.     Plaintiff Sam's East, Inc. is an Arkansas corporation with its principal place of business in Bentonville, Arkansas.

14.     Plaintiffs own and operate retail stores and warehouse clubs that sell packaged tuna products sold in pouches or other ready-to-eat packaging. During the Relevant Period, Plaintiffs and their subsidiaries and affiliates directly purchased packaged tuna at inflated prices in the United States (including this District) from one or more of the Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the antitrust violations alleged in this complaint.

15.     Plaintiffs employ more than 1.4 million people in more than 5,000 stores nationwide, collectively are by far the largest grocery retailer in the United States, and are by any measure the largest seller of packaged tuna products in the United States. During the Relevant Period, Plaintiffs sold approximately 25% or more of all packaged tuna products sold in the United States.

16.     Defendant Bumble Bee Foods, LLC a/k/a Bumble Bee Seafoods ("Bumble Bee") is a Delaware limited liability company headquartered at 280 10th Avenue, San Diego, California 92101. Bumble Bee became a wholly owned corporate subsidiary of Connors Brothers Income Fund after Connors acquired it on April 30, 2004. In 2008, Bumble Bee became a privately held company when it was acquired by Centre Partners. And in December 2010, Bumble Bee was acquired by Lion Capital LLP, a private equity firm based in the United

4

Kingdom. In 2014, Lion Capital agreed to sell Bumble Bee to Thai Union Group P.C.L. ("Thai Union") for $1.5 billion, but that deal did not close because the public offering terminated due to antitrust concerns, as discussed in more detail below. Bumble Bee is North America's largest branded shelf-stable seafood company, offering packaged tuna, salmon, sardines, and specialty seafood products marketed in the United States under the brands Bumble Bee, Brunswick, Sweet Sue, Snow's, Beach Cliff, Wild Selections, and Bumble Bee SuperFresh. According to estimates, Bumble Bee has 25–28% market share in U.S. packaged tuna industry.[1] Bumble Bee generated nearly $1 billion of annual sales in 2014, with estimated 2014 earnings before interest, taxes, and depreciation of approximately $145 million. Bumble Bee's participation in the conspiracy alleged in this complaint violated Section 1 of the Sherman Act.

17.     Defendant StarKist Company ("StarKist") is a corporation organized, existing, and doing business under the laws of the State of Pennsylvania. StarKist's principal place of business is 225 North Shore Drive, Suite 400, Pittsburgh, PA 15212. StarKist is a wholly owned subsidiary of Defendant Dongwon Enterprise Co., Ltd. ("Dongwon"), which is based in Seoul, South Korea. StarKist's tuna processing facilities are located in Pago Pago, American Samoa. StarKist produces and sells packaged tuna products throughout the United States. Dongwon acquired the StarKist brand and related manufacturing from Del Monte Foods, USA in October 2008 for approximately $363 million. Currently, StarKist is the largest participant in the packaged tuna market in the United States, with estimated market share in the range of 30–44%.[2]

18.     Defendant Del Monte Foods Company is a Delaware corporation with its principal place of business at One Market @ The Landmark, San Francisco, California 94105.

---

[1] U.S. International Trade Commission, *Fact Sheet: Update on the Likely Impact of U.S. Tariff Modification for Tuna Imported From ATPA Beneficiaries, 2002*.

Del Monte managed the operations of StarKist during the time it owned StarKist, from December 2002 until October 2008, and thereafter continued to manage StarKist, including its sales and packaged tuna pricing, under an operating agreement with Dongwon until October 2010, at which time Dongwon became the operator of StarKist. Key StarKist executives also served as Del Monte executives during the time Del Monte owned and operated StarKist. For example, Don Binotto served as StarKist's CEO from the 1990s through November 2010 when StarKist was owned first by Heinz, then by Del Monte, and finally by Dongwon. Joseph Tuza was a Del Monte marketing executive between May 2006 and August 2008, and then was a StarKist Sr. VP of Marketing, from August 2008 until November 2011. StarKist and Del Monte are referred to as the StarKist defendants. The StarKist defendants' participation in the conspiracy alleged in this complaint violated Section 1 of the Sherman Act.

19.     Defendant Tri-Union Seafoods, LLC, doing business as Chicken of the Sea International, Inc. ("Tri-Union" or "Chicken of the Sea"), is a California limited liability company with its principal place of business located at 9330 Scranton Road, Suite 500, San Diego, California 92121. Tri-Union is owned by Thai Union, a publicly held Thai corporation headquartered in Samutsakhon, Thailand, and produces and sells packaged tuna products throughout the United States. Chicken of the Sea operates its tuna processing facility in Lyons, Georgia. Chicken of the Sea's share of the U.S. packaged tuna market has been estimated at 13–20%. The Chicken of the Sea brand and manufacturing facilities were acquired by Tri-Union in 1997 from Van Camp Seafood Company. Tri-Union sells shelf-stable seafood products under brand names including Chicken of the Sea, Van Camp's, Genova, Pacific Pearl, and Ace of Diamonds throughout the United States. In 2013, Chicken of the Sea earned more than $400

---

[2] U.S. International Trade Commission, *Fact Sheet: Update on the Likely Impact of U.S. Tariff Modification for*

million in U.S. revenues. In 2014, Thai Union earned gross profit of approximately $547 million on worldwide revenue of $3.34 billion. Chicken of the Sea's participation in the conspiracy alleged in this complaint violated Section 1 of the Sherman Act.

20.      The acts alleged herein to have been committed by Defendants were authorized, ordered, or performed by Defendants' directors, officers, managers, employees, agents, or representatives in the course of their employment and while actively engaged in the management of Defendants' businesses.

## UNNAMED CO-CONSPIRATORS

21.      Other entities and natural people not named as Defendants colluded or conspired with Defendants and committed acts in furtherance of the conspiracy alleged in this Complaint. Discovery will establish the full scope, nature, and extent of the conspiracy. Plaintiffs reserve the right to amend or supplement this Complaint to add other Defendants or other allegations based upon discovery and further investigation.

## AGENTS

22.      The acts alleged to have been done by Defendants were authorized, ordered, or performed by their directors, officers, managers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

## INTERSTATE TRADE AND COMMERCE

23.      Throughout the Relevant Period, Defendants and their co-conspirators agreed to raise, fix, inflate, maintain, or stabilize prices of packaged tuna products, which has substantially affected the flow of interstate or foreign commerce.

---

*Tuna Imported From ATPA Beneficiaries, 2002.*

24.     Defendants and their co-conspirators sold and shipped substantial quantities of packaged tuna in a continuous and uninterrupted flow of interstate and foreign commerce. Defendants' sale and shipping of packaged tuna have had a substantial effect upon interstate or foreign commerce.

## FACTUAL ALLEGATIONS

25.     **Background.** Packaged seafood is composed of raw seafood processed to preserve and enhance flavor, and ensure product safety. Because it is typically caught far offshore, raw seafood is usually delivered to canneries frozen or refrigerated.

26.     Upon delivery to a processing plant, an initial quality control inspection is performed to ensure the seafood is stored and transported at the proper temperature, and is in acceptable condition. The seafood is maintained at temperatures ranging from 0°C to -18°C until processed. Seafood passing the initial quality control inspection is prepared for packaging.

27.     Accepted seafood is initially transferred to large ovens for "precooking." After further cleaning, the seafood is fed into filling machines where product packages (cans, pouches, or cups) are filled with pre-set amounts. Filled packages are moved to sealing machines where they are closed and sealed.

28.     Each package is affixed with a permanent production code identifying plant, product, date packed, batch, and other information. Filled and sealed packages are then cooked under pressure to make the products commercially sterile.

29.     Defendants sell packaged seafood in the United States, including packaged tuna, clams, salmon, and sardines. Bumble Bee and Chicken of the Sea also sell packaged crabs, mackerel, oysters, and shrimp.

8

30.     The United States packaged seafood industry generates annual sales of approximately $2.6 billion. Packaged tuna is the largest category within packaged seafood, generating estimated annual sales of approximately $1.7 billion.

31.     **The Packaged Tuna Market's Oligarchical Structure.** The packaged seafood market is a multibillion-dollar industry in the United States. Packaged tuna, the major component of the packaged seafood market, is sold to club warehouses, retail grocers, grocery cooperatives, mass merchandisers, drug stores, and other retailers. According to a May 2012 Bumble Bee presentation, packaged tuna represents approximately 73% of the packaged seafood market.

32.     Defendants are the three largest domestic manufacturers of packaged tuna, and the industry is highly concentrated. According to the aforementioned presentation by Bumble Bee, StarKist had 34.6% of the packaged tuna market, Bumble Bee had 27.8%, and Chicken of the Sea had 19.4%.

33.     Similarly, in December 2014, the *Wall Street Journal* reported that Chicken of the Sea held 13%, Bumble Bee held 25%, and StarKist held 36% of the domestic market for packaged tuna. And a report by Bualuang Securities indicated that StarKist held 30% of the domestic packaged tuna market, Bumble Bee held 28%, and Chicken of the Sea held 20%.

34.     The oligopolistic market share division within the packaged tuna industry is the result of recent mergers and acquisitions. For example, in 1997, Tri-Union Seafoods LLC acquired Van Camp Seafood Company ("Van Camp"). Thereafter, Thai Union Frozen Products, which was an investor in Tri-Union, bought out other investors, acquired 100% ownership of Van Camp, and renamed the company Chicken of the Sea. In 2008, Dongwon acquired StarKist from Del Monte Foods for $363 million.

35.     Walmart purchased packaged tuna products directly from Defendants during the Relevant Period. Walmart's purchases of packaged tuna products were approximately $400 million per year during the Relevant Period and constituted approximately 25% or more of the packaged tuna products sold by Defendants.

36.     **Barriers to Entry.** During and before the Relevant Period, there were barriers to entry into the market for the production and sale of packaged tuna in the United States, including, without limitation, the following.

37.     Aspiring market participants faced substantial startup costs, including the need to gain access to distribution channels and retail outlets. Additionally, substantial manufacturing expertise was required to enter the U.S. market. These startup costs reduced the opportunity or ability for rivals to enter the U.S. market and undercut Defendants' and their conspirators' supracompetitive pricing.

38.     The method used for processing packaged tuna in the United States has long been capital intensive. New entrants and existing market participants faced substantial upfront, industry-specific costs to build plants to process tuna loins into packaged tuna. The costs Defendants have faced in modernizing their own facilities demonstrate the significant financial burden placed on new entrants. For example, modernizing a single plant in Pago Pago, American Samoa, which Tri Marine acquired from Chicken of the Sea in 2010, took approximately five years and cost approximately $70 million. Given costs related to real estate acquisition and plant construction and/or modernization, establishing packaged tuna production in the United States would likely cost more than $70 million and require substantial industry expertise.

39.     Tariffs provide another significant barrier for aspiring new market participants. Restrictive tariffs on the importation of packaged tuna into the United States range from 6–35%

10

and impair the ability of foreign suppliers to undercut supracompetitive domestic pricing of packaged tuna.

40.      Defendants possessed significant market power to raise prices for packaged tuna above competitive levels in the United States with a combined market share of 80–85% during 2003–2015, and they conspired to ensure they would stabilize and maintain their market shares in the packaged tuna market despite declining demand.

41.      There are no economically reasonable substitutes for packaged tuna. Alternative forms of seafood, such as frozen seafood or fresh seafood, require refrigeration and preparation, such as cooking, before they can be consumed, and lack the convenience, consistent portion size, and ease of use of packaged tuna.

42.      **Department of Justice Antitrust Investigation.** On July 17, 2015, Thai Union announced the acquisition of Bumble Bee for $1.5 billion. On July 23, 2015, Thai Union suspended the public offering and confirmed that the United States Department of Justice ("DOJ") had begun an industrywide antitrust investigation into the price fixing of packaged seafood products in the United States. A *Global Competition Review* article reported:

> In a letter to the Bangkok stock exchange on Wednesday, Thai Union chairman Kraisorn Chansiri confirmed that the US Department of Justice is investigating his company's sector, causing Thai Union to suspend a stock issuance that had been intended to finance the $1.5 billion acquisition of Bumble Bee.

> He said the Thai Union subsidiary Tri-Union Seafoods, which operates in the US under the Chicken of the Sea brand, had received a subpoena "requiring Tri-Union to provide relevant information to the DOJ in relation to an antitrust investigation of the packaged seafood industry in the United States."

43.      The *Global Competition Review* article further states:

> An industry expert said the subpoena does not appear to be limited to the merger review, and early information indicates the demand for information came from a separate section of the antitrust division, not one tasked with analyzing deals.

It is highly likely that something produced in the merger investigation sparked this investigation touching the industry as a whole rather than just the parties to the deal, he said.

44.     If Thai Union's acquisition had been successful, it would have resulted in a duopoly in the packaged seafood market, with Thai Union controlling approximately 48% of the market, and StarKist controlling approximately 30%.

45.     Kraisorn Chansiri, Thai Union's chairman, reported that Bumble Bee and Chicken of the Sea had also received grand jury subpoenas in relation to the DOJ investigation into potential antitrust violations in the packaged seafood industry.

46.     On December 3, 2014, the DOJ announced that Thai Union, owner of Tri Union Seafoods LLC d/b/a Chicken of the Sea International, and Bumble Bee Foods LLC abandoned their plans to merge after the DOJ informed them it had serious concerns that, if the transaction were successful, it would harm competition.

47.     Assistant Attorney General William J. Baer of the DOJ's Antitrust Division stated "[o]ur investigation convinced us—and the parties knew or should have known from the get go—that the market is not functioning competitively today, and further consolidation would only make things worse."

48.     On October 13, 2015, a news article revealed that the DOJ's merger review uncovered evidence of the packaged tuna industry cartel. As a result, Chicken of the Sea sought "Type B" leniency from the DOJ, which grants full immunity to the first company to come forward and admit cartel violations.[3] When applying for leniency, an applicant must establish

---

[3] *See* http://www.justice.gov/atr/frequently-asked-questions-regarding-antitrust-divisions-leniency-program.

"[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials."[4]

49.     On September 16, 2015, Thai Union held an Extraordinary General Meeting of Shareholders. The minutes of that meeting state:

> Khun Thiraphong Chansiri [Chairman of Thai Union's Board of Directors] clarified: on the capital increase issue, the Company had a resolution from the Board of Directors and had the approval from the Office of Securities and Exchange Commission to delay the capital increase process for 6 months. The main reason for the delay request was that the week prior to the due date of the capital increase payment, Tri-Union Seafood or Chicken of the Sea International in the United States of America was notified by the Department of Justice of the USA that the investigation on illegal actions regarding Anti-Trust of the whole packaged seafood industry in USA was being carried out, not limited to only on the Company. Hence the Company had consulted with the Board of Directors and the legal consultants who shared their viewpoints that the Company should delay its capital increase due to a high degree of uncertainty in such serious matter and to provide time to the shareholders to thoroughly and completely study the facts. The Company had no urgent need to use the fund from the capital increase whatsoever. The Company thus returned the fund to the shareholders. On the lawsuit issues, the Company has been keeping an eye on but still retains no clear facts and data because the investigation was on the whole industry. Also the Company has been informed that the investigation process takes 2–3 years.

50.     On October 13, 2015, an *Mlex* article reported that:

> It is understood that during the course of the DOJ's merger review, evidence of the cartel was uncovered. Chicken of the Sea then sought leniency from the DOJ, which grants full immunity to the first company to come forward and admit to cartel violations.

> It is likely that Chicken of the Sea is seeking so-called "Type B" leniency, in which DOJ uncovers wrongdoing and then uses a company's cooperation to build out its case.

51.     The significance of Chicken of the Sea seeking Type B leniency is explained on the DOJ website:

> *Does a leniency applicant have to admit to a criminal violation of the antitrust laws before receiving a conditional leniency letter?*

---

[4] *Id.*

Yes. The Division's leniency policies were established for corporations and individuals "reporting their illegal antitrust activity," and the policies protect leniency recipients from criminal conviction. Thus, the applicant must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes before it will receive a conditional leniency letter. Applicants that have not engaged in criminal violations of the antitrust laws have no need to receive leniency protection from a criminal violation and will receive no benefit from the leniency program.[5]

52.    **Economic Incentives to Conspire.** Economic and other indicators support the conclusion that pricing in the packaged tuna market is collusive. Since approximately 1960, supply for packaged tuna has seen a dramatic increase due to innovations in fishing and other factors. By contrast, demand has been decreasing since approximately 1985. Under natural market conditions, such market forces should have put significant downward pressure on tuna prices. But due to collusion, the opposite happened. Despite changes in supply and demand of packaged tuna, prices have increased since 2007, with significant increases beginning in 2011. The graph below depicts the steady increase in skipjack tuna catch volume from 1960 through 2013, according to the Food and Agriculture Organization of the United Nations.[6]



53.    Economic data show the demand for, and consumption of, packaged tuna in the United States has decreased substantially. For example, *Undercurrent News* reported that annual

---

[5] *See* http://www.justice.gov/atr/frequently-asked-questions-regarding-antitrust-divisions-leniency-program.

packaged tuna consumption had fallen from 3.4 pounds per capita in 1998 to 2.5 pounds in 2009, with consumption continuing to decline.[7] The data are as follows:

| Year | Salmon | Sardines | Tuna | Shellfish | Other | Total |
|------|--------|----------|------|-----------|-------|-------|
| | | | ------ Pounds ------ | | | |
| 1985 | 0.5 | 0.3 | 3.3 | 0.5 | 0.4 | 5.0 |
| 1986 | 0.5 | 0.3 | 3.6 | 0.5 | 0.5 | 5.4 |
| 1987 | 0.4 | 0.3 | 3.5 | 0.5 | 0.5 | 5.2 |
| 1988 | 0.3 | 0.3 | 3.6 | 0.4 | 0.3 | 4.9 |
| 1989 | 0.3 | 0.3 | 3.9 | 0.4 | 0.2 | 5.1 |
| **1990** | **0.4** | **0.3** | **3.7** | **0.3** | **0.4** | **5.1** |
| 1991 | 0.5 | 0.2 | 3.6 | 0.4 | 0.2 | 4.9 |
| 1992 | 0.5 | 0.2 | 3.5 | 0.3 | 0.1 | 4.6 |
| 1993 | 0.4 | 0.2 | 3.5 | 0.3 | 0.1 | 4.5 |
| 1994 | 0.4 | 0.2 | 3.3 | 0.3 | 0.3 | 4.5 |
| 1995 | 0.5 | 0.2 | 3.4 | 0.3 | 0.3 | 4.7 |
| 1996 | 0.5 | 0.2 | 3.2 | 0.3 | 0.3 | 4.5 |
| 1997 | 0.4 | 0.2 | 3.1 | 0.3 | 0.4 | 4.4 |
| 1998 | 0.3 | 0.2 | 3.4 | 0.3 | 0.2 | 4.4 |
| 1999 | 0.3 | 0.2 | 3.5 | 0.4 | 0.3 | 4.7 |
| **2000** | **0.3** | **0.2** | **3.5** | **0.3** | **0.4** | **4.7** |
| 2001 | 0.4 | 0.2 | 2.9 | 0.3 | 0.4 | 4.2 |
| 2002 | 0.5 | 0.1 | 3.1 | 0.3 | 0.3 | 4.3 |
| 2003 | 0.4 | 0.1 | 3.4 | 0.4 | 0.3 | 4.6 |
| 2004 | 0.3 | 0.1 | 3.3 | 0.4 | 0.4 | 4.5 |
| 2005 | 0.4 | 0.1 | 3.1 | 0.4 | 0.3 | 4.3 |
| 2006 | 0.2 | 0.2 | 2.9 | 0.4 | 0.2 | 3.9 |
| 2007 | 0.3 | 0.2 | 2.7 | 0.4 | 0.3 | 3.9 |
| 2008 | 0.1 | 0.2 | 2.8 | 0.4 | 0.4 | 3.9 |
| 2009 | 0.2 | 0.2 | 2.5 | 0.4 | 0.4 | 3.7 |
| **2010** | **0.2** | **0.2** | **2.7** | **0.4** | **0.4** | **3.9** |
| 2011 | 0.2 | 0.2 | 2.6 | 0.4 | 0.4 | 3.8 |
| 2012 | 0.2 | 0.2 | 2.4 | 0.4 | 0.4 | 3.6 |
| **2013** | **0.4** | **0.2** | **2.3** | **0.4** | **0.4** | **3.7** |

U.S. ANNUAL PER CAPITA CONSUMPTION OF CANNED FISHERY PRODUCTS, 1985-2013

54.   The National Marine Fisheries Service reported similar trends for consumption of packaged fish from 1985 to 2013:

---

[6] *See* http://www.fao.org/fishery/species/2494/en.
[7] *See* https://www.undercurrentnews.com/2014/12/19/can-thai-union-bumble-bee-tie-up-reverse-us-tuna-consumption-decline/.



55.     An article by the *Washington Post* based on data from the U.S. Department of Agriculture also reports a decline in consumption.[8]

56.     Despite changes in supply and demand that should have led to lower prices, Plaintiffs (including their affiliates and subsidiaries) continued to pay higher prices for packaged tuna products during the Relevant Period to each of the Defendants and their co-conspirators. This price increase scheme, which resulted in supracompetitive prices to Plaintiffs (including their affiliates and subsidiaries), was the result of a conspiracy among the Defendants and their co-conspirators.

57.     Given the decline in consumption of packaged tuna, one would expect rational businesses to reduce the prices for packaged tuna, but that did not happen. The following chart, taken from data available at the Bureau of Labor Statistics, depicts seasonally adjusted U.S. city average prices for shelf-stable fish and seafood from January 2005 through the first part of 2015, with the period 1982–84 used as a baseline.

---

[8]   *See* https://www.washingtonpost.com/news/wonk/wp/2014/08/18/how-america-fell-out-of-love-with-canned-tuna/.



During the conspiracy and as a result of it, the price of packaged tuna sold to Plaintiffs and other U.S. retailers increased at the same time that supply increased and demand plummeted. This incongruity is depicted in the chart below, which shows an increase in U.S. spending on canned seafood (packaged tuna accounts for approximately 75% of all canned seafood spending) despite continued consumption decline after 2010.



58.     Recent price increases in packaged tuna products are not explained by increases in raw material costs. While the cost per metric ton of skipjack tuna rose in 2012 and early 2013, it declined precipitously thereafter. According to the April 19, 2015 issue of *Tuna Market Intelligence,* "[a]s recently as June last year, skipjack was selling at US $l,800 in Bangkok. But the price has since plummeted to US $1,000 since the beginning of the year, with industry officials anticipating further reductions in price this year." Tuna exporters in Ecuador noted in January of 2015 that the price per metric ton had declined from $1,400 to $800. The United Nations Food & Agriculture Organization noted in its May 2015 *Food Outlook* biannual report that tuna prices had dropped considerably in 2014: "tuna prices declined significantly due to excess supply, with frozen skipjack prices hitting a 6-year low." Despite these drastically declining raw material costs, Defendants did not attempt to decrease prices to expand their market share.

59.     Between 2010 and 2012, packaged tuna wholesale and retail prices in the United States increased by 10.9% and 6.6%, respectively. At the same time, packaged tuna consumption continued to decline across the United States, falling by 7.7% between 2011 and 2012. In December 2012, an FAO newsletter noted that "[s]luggish demand for canned tuna continues in the US market. Under the current economic conditions consumers are reluctant to accept higher canned tuna prices, while supermarkets are unable to promote the product as a low-priced item as they could in the past." Defendants' pricing conduct was contrary to their individual self-interest.

60.     These price increases in 2011–12 achieved Bumble Bee's goal of ensuring that the industrywide prices for canned tuna were no longer "too cheap." In July 2012, Bumble Bee's CEO stated, "we believe the market will adjust to the new price levels over the next year

as tuna remains a healthy and affordable protein." He added that "[u]nfortunately, higher prices—*up more than 40 percent over the last 18 months*—are negatively impacting overall consumption and promotional sales volume is down as retailers are not able to achieve the 'hot' price points that historically enabled them to drive tuna volume." (Emphasis added). Thus, Bumble Bee conceded that the previous 18 months of price increases were driving down consumer demand and promotional volume—something contrary to the individual self-interest of Chicken of the Sea, Bumble Bee, and StarKist. Likewise, in a March 2012 interview, In-Soo Cho (former President and CEO of StarKist) stated that the company was taking action to increase prices. He said that "[i]n America, all they have done is say: 'two cans for a dollar, three cans for a dollar'—but that has to change." The 2011–12 list price increases set benchmarks that affected all subsequent list prices of canned tuna.

61.     Industry experts have found the demand for packaged tuna to be highly inelastic. For example, Ronald A. Babula and Roger L. Corey, Jr. calculated a price elasticity of demand coefficient of -0.3 for domestically produced packaged tuna in the U.S. market in 2004. This reflects "a consumer product widely viewed as almost a necessity in a well-stocked pantry." A demand elasticity of -0.3 suggests that a 10% increase in price can be achieved by controlling supply sufficiently to reduce supply by only 3%. Due to its inelasticity, small changes in the supply of packaged tuna can effect large changes in price, and price increases in packaged tuna are highly profitable for suppliers, because the percentage change in price far outweighs the percentage reduction in sales.[9]

62.     Because of changes in supply and demand, by at least 2010–2011, Defendants shared the common interest of increasing profitability in what would have resulted in economic

losses absent cooperation and collusion. By 2008, Thai Union had set an annual revenue target of $3 billion by 2012, to finance further acquisitions. In this same period, Dongwon acquired StarKist for $363 million, and Lion Capital acquired Bumble Bee for $980 million. These revenue expectations would have been unattainable in a competitive market. Because the United States represents the largest consumer of packaged tuna, it was a key target for Defendants' economic plans.

63.     To reach their financial goals, Defendants and their co-conspirators engaged in a continued conspiracy from approximately 2008–2010 until at least July 2015, when the DOJ investigation was made public. Defendants and their co-conspirators agreed not to compete on the sale of packaged tuna to Plaintiffs and other U.S. retailers. As a result, Plaintiffs (along with their subsidiaries and affiliates) and other retailers paid Defendants supracompetitive prices and suffered direct and substantial damage.

64.     Defendants reaped substantial profits from their collusive supracompetitive tuna pricing. For example, Thai Union d/b/a/ Chicken of the Sea realized a net profit increase from $61 million in 2008 to $140 million in 2014. In its 2013 Annual Report, dated February 24, 2014, Thai Union attributed its increasing profits and profit margins to "more rational US market competition" for packaged tuna products. This "more rational" competition was not competition at all; it was collusion. The following year, in its 2014 Annual Report, Thai Union commented:

> Thanks to *reduced price competition* (absence of cut throat pricing) and generally lower fish cost, our own tuna brands marked a great year of increased profitability. Despite minimal sales growth in the US, competitive inventory cost and *reasonable market conditions* helped lift the margin of our US brand. (Emphasis added.)

---

[9] *See* "U.S. Canned Tuna Supply and Demand," Journal of Int'l Food & Agribusiness Mktg.,Vol. 16, Issue 2 (2004), *available at* http://www.tandfonline.com/doi/pdf/10.1300/J047v16n02_09.

65.     Bumble Bee achieved similar profitably as a result of the conspiracy. In 2010, Lion Capital purchased Bumble Bee for $980 million, and in 2014, Lion Capital reached an agreement to sell Bumble Bee to Thai Union in 2014 for $1.5 billion. In announcing the sale, Lion Capital noted that Bumble Bee's EBITDA in 2014 was a record-breaking $150 million, on revenue of $1 billion.

66.     According to *Undercurrent News,* StarKist has been similarly profitable.

67.     **Defendants' Illegal Conspiracy.** Defendants and their co-conspirators carried out their conspiracy through in-person meetings and communications, including, among other means, email and telephone calls. During these meetings and communications, Defendants agreed on the terms of their conspiracy and exchanged confidential packaged tuna pricing and production information, including future confidential pricing and production information, and Defendants agreed on the timing and amount of price increases to Plaintiffs and others in the United States. That conspiracy allowed Defendants to reap supracompetitive profits.

68.     During the Relevant Period, Defendants' senior executives met at least twice annually and regularly discussed prices and shared sensitive customer information.

69.     During the Relevant Period, Defendants' executives also communicated regularly by telephone to discuss prices and sensitive customer information. For example, during at least one telephone conversation between Bumble Bee and StarKist executives, StarKist informed Bumble Bee that StarKist and Chicken of the Sea agreed to raise prices.

70.     One method by which the Defendants collusively raised prices was through bilateral communications among them. For example, between late December 2011 and January 18, 2012, extensive telephone communications occurred between senior executives and sales personnel of Bumble Bee, Chicken of the Sea, and StarKist (including, on information and

belief, Chris Lischewski and Scott Cameron of Bumble Bee, and John Sawyer of Chicken of the Sea) that resulted in an agreement to raise list prices across their lines of tuna products. Advanced copies of price announcements were circulated among Defendants' executives. Pursuant to the agreement, StarKist announced a list price increase on January 13, 2012, effective March 26, 2012; Bumble Bee announced a virtually identical list price increase on January 17, 2012, effective April 1, 2012; and Chicken of the Sea announced a virtually identical list price increase on January 18, 2012, effective April 1, 2012. Depending on the product, the price increases led to virtually identical list prices or price increases by a virtually identical amount.

72.     In addition, Defendants reached an understanding that each would not engage in aggressive promotion of their packaged tuna products. These communications took place in 2012 and 2013 and consisted of complaints from one or more of them against the third party, which responded that it would not engage in aggressive promotion and that the complained of promotion would not be repeated. With these telephone and email communications among senior executives and sales personnel regarding the specific terms on which they priced packaged tuna to their customers, Defendants assured each other that they would not compete on packaged tuna pricing.

72.     Given Defendants' control of a significant majority of the packaged tuna market, they had ample opportunity to collude in industry meetings and related events, including but not limited to the National Fisheries Institute ("NFI") Tuna Council and the International Seafood Sustainability Foundation ("ISSF"). Defendants also regularly attended the biannual "tuna conference"—typically held in Bangkok, but never in the United States (where there is more active antitrust enforcement).

73.     The NFI is a non-profit organization that purportedly is "dedicated to education about seafood safety, sustainability, and nutrition." The Tuna Council is a trade association within the NFI. The Tuna Council meets multiple times per year and met during the Relevant Period. StarKist, Bumble Bee, and Chicken of the Sea are the only members of the Tuna Council. During the Relevant Period and in furtherance of the conspiracy, Defendants and their co-conspirators met and communicated under the auspices of the Tuna Council and exchanged confidential information regarding pricing, production, and other strategic information pertaining to the production, pricing, and/or sale of packaged tuna.

74.     Defendants are also members of the ISSF. The ISSF is a trade group founded in 2009 by Defendants StarKist, Bumble Bee, and Chicken of the Sea. The ISSF existed during the Relevant Period. Its members also include fishery and cannery companies that catch and process tuna. During the conspiracy period and in furtherance of the conspiracy, Defendants and their co-conspirators met or otherwise communicated under the guise of the ISSF and exchanged confidential pricing, production, and other information pertaining to the production, pricing, and/or sale of packaged tuna.

75.     Bumble Bee, Chicken of the Sea, and StarKist jointly sponsored the advertising campaign "Tuna the Wonderfish" in 2011–2012 to remedy the decline in tuna consumption and the perception of tuna as a cheap protein. This campaign was sponsored by Defendants and carried out under the auspices of the Tuna Council. In connection with the campaign, Defendants teamed up for marketing purposes. Joe Tuza, Senior VP of Marketing for StarKist, reportedly remarked that the Tuna Council members "worked together surprisingly well." He said further that the campaign, which was intended to increase consumption of tuna, was based on the hope that, "as the water level rises … all boats rise with the tide," referring to the three Tuna Council

members. The same philosophy appears to undergird Defendants' price-fixing conspiracy. Although the campaign was unsuccessful in boosting consumption, Defendants nonetheless jointly implemented price increases at least three times in 2011 and 2012 in the face of falling demand.

76.     During the Relevant Period, former executives of one Defendant regularly became executives at their former competitors. Within the past 20 years, numerous individuals have held executive or senior sales/marketing positions for more than one Defendant (while maintaining close interlocking relations with former colleagues), including, but not limited to: Chris Lischewski (VP of Procurement at StarKist from 1991 to 1998, and then President and CEO of Bumble Bee, from 1999 to present); Jan Tharp (Sr. VP of Supply Chain at StarKist, from December 2008 to July 2010, Sr. VP, Operations at Bumble Bee, from July 2010 to September 2012, and then Executive VP/COO at Bumble Bee, from September 2012 to present); J. Douglas Hines (Sr. VP, Sales & Marketing at Chicken of the Sea in the 1990s, joining Bumble Bee in 1997, where he served as Bumble Bee's Executive VP and COO from September 2008 to September 2012); Joseph Clancy (VP Sales/Marketing at StarKist, from 1985 to 2002, and then VP Retail Sales at Chicken of the Sea, from November 2002 to December 2010); Kevin McClain (VP of Supply Chain at Chicken of the Sea, from 1979 to 2009, and then VP Resourcing at Bumble Bee, from 2009 to present); David Burt (General Manager – Marketing at StarKist from 2000 to 2004, and then VP Sales Specialty Markets at Bumble Bee, from March 2004 to present); Hubert Tucker (Sales Manager at Chicken of the Sea, from December 1997 to July 2012 and then StarKist's Director of Sales Eastern Zone, from July 2012 to present); Donald Stanton (General Manager Inventory Control at StarKist, from 1985 to 2001 and then VP Supply Chain at Bumble Bee, from October 2005 to January 2009); and Dennis Hixson (VP Sales

Specialty Markets at Chicken of the Sea, from 2005 to 2013, and then Sr. Retail Operations Manager at StarKist, from 2014 to present).

77.     During the Relevant Period, Ken Worsham, Bumble Bee's Sr. VP of Marketing since at least 2001, frequently discussed future pricing and shared customer opportunities with his father, Bob Worsham, a StarKist pricing consultant since the 1980s, and then shared StarKist's future pricing information with executives at Bumble Bee.

78.     During the Relevant Period, Bumble Bee's Don George discussed future pricing with former Chicken of the Sea associates. Don George was Sr. VP of Trade Marketing and Innovation at Chicken of the Sea from June 1979 until May 2006, when he became VP of Trade Marketing at Bumble Bee.

79.     In or around 2011, Jan Tharp, then Bumble Bee's Sr. VP Operations, attended a meeting at a hotel with executives from StarKist and Chicken of the Sea, at which the executives agreed that all three companies would collectively raise prices. Tharp had previously served as StarKist's Sr. VP Supply Chain from December 2008 through July 2010. In March 2011, effective May 2011, at least Bumble Bee and StarKist announced a price increase.

80.     During the Relevant Period, Chicken of the Sea held weekly executive meetings on Fridays at 10:00 a.m. They were led by its CEO (John Signorino and later Shue Wing Chan), and attended by all department heads, including John Sawyer, Sr. VP Sales and Marketing, from 2006 until August 2013; Bob Blatt, CFO from the late 1990s to 2013; Jim Davet, Sr. VP Operations, from 2005 until 2008; Mike White, Director of Marketing since the late 1980s; and Kevin McClain, VP of Supply Chain until 2009. At these meetings Sawyer, White, and Signorino/Chan discussed competitors' future price increases for packaged tuna products. On

multiple occasions, Sawyer presented the group with StarKist's future price lists (described as "market intelligence"), which Sawyer received from StarKist.

81.     During the Relevant Period, Mike White, Chicken of the Sea's Director of Marketing since the late 1980s, regularly contacted his counterparts at StarKist (including Joseph Tuza, a Del Monte executive and StarKist Sr. VP of Marketing, from August 2008 until November 2011), and Bumble Bee to confirm price quotations that customers claimed to have received from his competitors.

82.     Discussions among the Defendants led to periodic coordinated price increases at similar times and similar amounts, including, as examples:

a.   In summer 2003, at least Chicken of the Sea and Del Monte, on behalf of StarKist, announced list price increases on certain packaged tuna products;

b.   In the first quarter of 2004, Bumble Bee, Chicken of the Sea, and Del Monte, on behalf of StarKist, announced list price increases on certain packaged tuna products;

c.   In September 2004, effective in October 2004, Bumble Bee, Chicken of the Sea, and Del Monte, on behalf of StarKist, announced list price increases of 8% on packaged tuna products;

d.   In summer 2008, Bumble Bee, Chicken of the Sea, and Del Monte, on behalf of StarKist, announced list price increases of approximately 8.5%;

e.   In March 2011, effective May 2011, at least Bumble Bee and StarKist announced list price increases;

f.  In January 2012, effective late March or early April 2012, Chicken of the Sea, StarKist, and Bumble Bee announced list price increases across their lines of tuna products; and

g.  In March-April 2012, effective July 2012, at least StarKist and Bumble Bee announced list price increases.

83.    Bumble Bee, Chicken of the Sea, and StarKist also colluded to resist efforts by environmental groups, such as Greenpeace, to make their products more sustainable and less harmful to oceanic ecosystems. For example, Defendants were subjected to substantial outside pressure to curtail the use of fish aggregating devices ("FADs"), which have been widely criticized as environmentally damaging because of, among other things, the large number of bycatch (including endangered sea turtles, sharks, and other non-targeted animals) inadvertently ensnared by the devices.

84.    Executives from Bumble Bee, Chicken of the Sea, and StarKist were concerned that a switch to a more sustainable method of fishing would decrease supply and put pressure on their margins. In late 2011, executives from the three companies began discussing the issue via email. They reached an agreement not to sell any branded FAD-free packaged tuna product during a teleconference the week of February 6, 2012. That agreement was confirmed in a February 17, 2012 email, and as a result, the three companies still do not offer any branded FAD-free packaged tuna products.

85.    Chicken of the Sea, Bumble Bee, and StarKist also entered into an agreement to limit promotions and discounts on packaged tuna that undercut their published pricing. Senior executives of each company then policed the agreement. For example, between approximately May 2012 and June 2013, there were complaints exchanged, predominantly in the form of emails

between senior executives of the companies, about incidents of perceived overly aggressive promotions. A complaint would typically result in reassurances among the companies that the particular advertisement or promotion was an isolated incident, rather than a play for additional market share, and that the promotion would not undercut the market price.

86.   In 2011, Bumble Bee and Chicken of the Sea entered into mutual co-packing agreements in which Bumble Bee's factory in Santa Fe Springs, California, would pack and can the tuna for Chicken of the Sea's west coast operations, and Chicken of the Sea's plant in Lyons, Georgia, would pack the packaged tuna for Bumble Bee's east coast operations. This co-packing arrangement provided an additional communication channel for Bumble Bee and Chicken of the Sea and enabled them to directly monitor each other's output and pricing and ensure that each conformed with the conspiracy. In addition, between the late 1990s and 2009, StarKist and Chicken of the Sea had a co-packing agreement concerning their facilities in American Samoa.

87.   During the Relevant Period, to ensure that Defendants and their co-conspirators could implement or maintain their collusive and supracompetitive price increases, each Defendant had a policy that it would not accept orders from a customer exceeding the customer's historical buying pattern whenever a price increase was pending. For instance, Steve Hodge, StarKist's Senior Vice President of Sales, explained this policy: "StarKist will not accept customer buyout orders which exceed normal ordering patterns." Through this policy, each conspirator enforced the conspiracy by refusing to increase market share while a price increase was pending.

88.   Tri Marine, which dealt with and/or partnered with Bumble Bee, Chicken of the Sea, and StarKist throughout relevant periods, was an efficient conduit for the exchange of price information. On its website, Tri Marine trumpeted its abilities at "market intelligence,"

explaining: "[Tri Marine] maintains commercial relationships with the major decision makers in the tuna industry. We use our access to industry leaders to understand the dynamics of the tuna market and the changing needs of boat owners, processors and brands." Tri Marine also trumpeted that it "works closely" with "partners" like Chicken of the Sea and StarKist. Renato Curto, President of Tri Marine, has long preached the gospel of "cooperation":

> If we are going to specialize and free ourselves to do what we do best, we are all going to have to cooperate with one another more than we ever have. In fact, I see no other issue as being more immediately important to us here today. Cooperation is vital to our industry.

89.     As explained, during the conspiracy, Defendants and co-conspirators faced supply and demand factors that should have led to declining prices for packaged tuna in the United States. The declining consumption of packaged tuna in the United States resulted in excess production capacity. Defendants and co-conspirators had sufficient production capacity in the United States to supply consumers with 3.4 pounds of canned tuna per capita in 2003. But by 2009, when annual per capita consumption had fallen to 2.5 pounds, a large portion of the capacity of Defendants and their co-conspirators went unused. Accordingly, the expanding global supply of canning-grade tuna, coupled with declining demand for packaged tuna and the excess domestic production capacity in the United States, left the packaged tuna industry ripe for collusion.

90.     Annual reports reflect Defendants' unlawful conspiracy. For example, in its 2013 Annual Report, Thai Union reported that "our branded tuna business showed resilient growth from 2012 thanks to the price adjustments in Europe and *more rational market competition in the US.*" (Emphasis added). The same report stated that Thai Union's future profit margins would depend upon "[r]easonable US canned tuna competition *without unnecessary price.*" (Emphasis

added). In its 2014 Annual Report, Thai Union explicitly noted that this goal had been achieved. The report stated:

> Thanks to *reduced price competition (absence of cutthroat pricing)* and generally lower fish cost, our own tuna brands marked a great year of increased profitability. Despite minimal sales growth in the US, competitive inventory cost and *reasonable market conditions* helped lift the margin of our US brand. (Emphasis added).

91.     During the Relevant Period, Defendants' conspiracy had the following effects, among others:

a.   Price competition was restrained or eliminated with respect to Packaged tuna; and

b.   The prices of packaged tuna were fixed, raised, maintained, or stabilized at artificially inflated levels.

92.     During the Relevant Period, Defendants charged supra-competitive prices for packaged tuna sold to Plaintiffs. By reason of Defendants' alleged violations of the antitrust laws, Plaintiffs sustained damages, injury, and harm to their businesses or property in an amount to be determined, having paid higher prices for packaged tuna than they otherwise would have paid absent Defendants' alleged illegal contract, combination, or conspiracy. This is an antitrust injury of the type the antitrust laws are meant to punish and prevent.

## TOLLING AND STATUTE OF LIMITATIONS

93.     Plaintiffs had neither actual nor constructive knowledge of the facts of collusion constituting their claim for relief and did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until at least July 2015.

94.     Throughout the Relevant Period, Defendants affirmatively and fraudulently concealed their unlawful conduct from discovery by Plaintiffs.

95.     Defendants' collusive communications were conducted through private meetings, telephone calls, and emails between and among executives that were not disclosed beyond an inner circle of trusted high-level colleagues, and because Defendants' communications with customers offered plausible yet pretextual reasons for Defendants' similar price movements, Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy, and Defendants' and their co-conspirators' involvement in the conspiracy, until July 23, 2015, when the DOJ's investigation first became public.

96.     Because the conspiracy was actively concealed through secret communications among Defendants and pretextual communications to customers until July 23, 2015, Plaintiffs were unaware of Defendants' and their coconspirators' unlawful conduct, and did not know they were paying artificially high prices for packaged tuna.

97.     The affirmative acts of Defendants and their co-conspirators, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

98.     Defendants and their co-conspirators agreed among themselves not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal conspiracy.

99.     Defendants and their co-conspirators met and communicated secretly concerning the pricing and marketing of packaged tuna to avoid detection.

100.    Throughout the Relevant Period, Defendants secretly agreed to implement similar or identical price increases on packaged tuna at similar times. To avoid detection by their customers, including Plaintiffs, Defendants issued announcements and made other

31

communications to the market that were intended to mislead their customers, including Plaintiffs, into believing that the pricing actions were taken independently by each Defendant because of cost increases that Defendants falsely claimed were unavoidable and industry-wide.

101.    In summer 2003, at least Chicken of the Sea and Del Monte, on behalf of StarKist, announced price increases for certain packaged tuna products, pretextually citing raw material cost increases. Chicken of the Sea's announcement falsely blamed the increase on falling "[c]atch rates," and a resulting increase in Skipjack prices, among other things.

102.    In the first quarter of 2004, Defendants each collusively increased their packaged tuna prices by similar amounts. On September 2, 2004, Del Monte Foods (at the time the parent of StarKist) held an earnings conference call on which its Chair, Rick Wolford, falsely attributed the joint price increases not to collusion, but to a "similar experience that we all have with tight Skipjack as well as tight albacore supplies."

103.    In summer 2004, Chicken of the Sea, Del Monte (on behalf of StarKist), and Bumble Bee announced increases in the price of six-ounce packages of "chunk light" tuna, falsely attributing the price increase to increases of raw materials due to, among other things, dwindling supply of light tuna. In an August 30, 2004 communication to its sales agents, Chicken of the Sea falsely advised that the price increase was due to an increase of prices of raw material costs, including natural gas, steel, freight, and fuel, as well as "poor catch rates and tight supply." It instructed its agents: "It is critical that this information be shared with all customers immediately." On September 2, 2004, Chicken of the Sea announced to all of its customers that it would increase prices by approximately 8% on six-ounce light tuna, effective on orders placed after October 18, 2004. According to the announcement, the increase was attributable to, among other things, "poor fishing conditions."

104.   Plaintiffs accepted and relied on the proffered reasons for the price increases.

105.   Defendants' statements were false because during the period of the price increases, the demand for packaged tuna was falling, while catch volumes for both Skipjack (the dominant canning light grade tuna) and Yellowfin (another popular light grade tuna), were increasing. The falling demand for tuna, when coupled with increased catch volumes, should have led to price decreases—not increases. Defendants' statements were also misleading because they failed to disclose that the true reason for the increase was Defendants' illegal conspiracy.

106.   On August 27, 2008, Del Monte Foods issued a price announcement to all of its "Valued Customers," advising of a StarKist price increase, effective November 3, 2008, due to "continued escalation of global Tuna fish prices," and stating that "[o]ver the next several days our sales agency and/or local sales management will be in contact with you to provide additional details and review plans that will continue the growth of our mutual business." In accordance with its announcement, Del Monte's agents and representatives contacted its customers over the next several months to provide detailed, but misleading, explanations for both recent and forthcoming StarKist price increases.

107.   For example, on or about October 1, 2008, Affiliated Foods, Inc. received a copy of a presentation from a Del Monte/StarKist sales agent falsely blaming the price increases on "significant fish price inflation since the start of 2007," and stating that additional increases would be necessary because "[s]ince the 7/21/08 price increase, fish costs have continued to increase. Light Meat costs are up an additional 18% and White Meat costs are up an additional 14%," driven in part by "high fuel costs." These representations were false because the prices of both crude oil and skipjack tuna (a light meat tuna) were flat or declining at the time the price

increases were announced. Del Monte/StarKist's statements also were misleading because they failed to disclose that the true reason for the increase was Defendants' illegal agreement.

108.    In its March 2011 announcement of a price increase effective in May 2011, StarKist cited increases in "Crude index," "Packaging costs," and "Fish costs." In its January 2012 announcement of a price increase effective March 2012, StarKist cited increases in the costs of crude oil, metal, and transportation, as well as "Record high fish costs." Chicken of the Sea, in its January 2012 announcement of a price increase effective March 2012, placed the blame on "High fish prices" and "higher raw material costs." Again in its March 30, 2012 announcement to "Our Valued Customers" of another price increase effective July 2012, Bumble Bee cited "global inflation, transportation cost increases stemming from global demand on fossil fuel, and resource materials (most notably on fish)." And StarKist, in its April 2012 announcement to "Our Valued Customers" of a price increase, effective in July 2012, cited "numerous costs increases" and escalating "fish costs" as the reasons for the price increase. These statements were misleading because they failed to disclose that the true reason for the increase was Defendants' illegal agreement.

109.    Plaintiffs could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and secrecy techniques employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy, or combination. Defendants' conspiracy was fraudulently concealed by various means and methods, including, but not limited to, secret meetings, misrepresentations to customers, and surreptitious communications among themselves and their co-conspirators via telephone and in-person meetings to prevent the existence of written records.

110.   Because the alleged conspiracy was affirmatively concealed by Defendants and their co-conspirators until July 23, 2015, Plaintiffs had no knowledge of the alleged conspiracy, or any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed.

111.   None of the facts or information available to Plaintiffs before July 23, 2015, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracy before July 23, 2015.

112.   As a result of Defendants' and their co-conspirators' fraudulent concealment of the price-fixing conspiracy, the running of any statute of limitations is tolled with respect to Plaintiffs' claims of anticompetitive conduct alleged in this complaint.

113.   The filing of the class action complaint regarding price fixing in the packaged tuna market, *see Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC et al*, 15-cv-01714 (S.D. Cal. Aug. 3, 2015) (Class Action Complaint), suspended the applicable statute of limitations for the period between the filing of the class action complaint and court's ruling on class certification.

## COUNT I: VIOLATION OF THE SHERMAN ACT (15 U.S.C. §§ 1, 3)

114.   Plaintiffs incorporate by reference the preceding paragraphs 1-113 as if fully set forth herein.

115.   Defendants and their co-conspirators engaged in a continuing contract, combination, and conspiracy to fix, raise, maintain and/or stabilize the price of packaged tuna products within the United States, in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

116.    The collusion and conspiracy alleged herein is a *per se* violation of Section 1 of the Sherman Antitrust Act.

117.    Alternatively, the combination and conspiracy alleged herein is a rule of reason violation of Section 1 of the Sherman Antitrust Act.

118.    Defendants intended to, and did, substantially restrain trade. They shared a conscious commitment to a common scheme designed to achieve the unlawful objective of artificially fixing, raising, pegging, maintaining, stabilizing, and otherwise manipulating the price of packaged tuna products sold in the United States.

119.    The conspiracy unreasonably restrained trade. There is no legitimate business justification for, or procompetitive benefits caused by, Defendants' unreasonable restraint of trade. Any ostensible procompetitive benefit was pretextual or could have been achieved by less restrictive means.

120.    Plaintiffs, directly and through their subsidiaries and affiliates, have been injured in their business and property by reason of Defendants' violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15.

121.    Plaintiffs, directly and through their subsidiaries and affiliates, are threatened with impending future injury to its business and property by reason of Defendants' continuing violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C.§ 1, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court:

A.      Adjudge and decree that the contract, combination, and conspiracy alleged herein is a *per se* unreasonable restraint of trade in violation of Section 1 of the Sherman Act;

B.      Enter joint and several judgments against the Defendants and in favor of Plaintiffs;

C.      Award damages (i.e., three times overcharges to Plaintiffs and their subsidiaries and affiliates) in an amount to be determined at trial, plus interest in accordance with law;

D.      Award Plaintiffs their costs of suit, including reasonable attorneys' fees, pre- and post-judgment interest as provided by law;

E.      Permanently enjoin Defendants and their co-conspirators, their respective successors, assigns, parents, subsidiaries and affiliates, and their respective officers, directors, agents and employees, and all other persons acting or claiming to act on their behalf or in concert with them, from directly or indirectly continuing, maintaining or renewing the combination, conspiracy, agreement, understanding or concert of action, or adopting any other practice, plan, program or design having a similar purpose or effect in restraining competition; and

F.      Award such further and additional relief as is necessary to correct for the anticompetitive market effects caused by the Defendants' unlawful conduct, as the Court may deem just and proper under the circumstances.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

Dated: October 31, 2016

By: _____

    Jess Askew III, Ark. Bar No. 86005
    Andrew King, Ark. Bar No. 2007176
    KUTAK ROCK LLP
    124 West Capitol Avenue, Suite 2000
    Little Rock, Arkansas 72201-3706
    (501) 975-3000 Telephone
    (501) 975-3001 Facsimile
    jess.askew@kutakrock.com
    andrew.king@kutakrock.com

    and

    Neal S. Manne (*Pro Hac Vice* Pending)
    Tex. Bar No.  12937980
    Vineet Bhatia (*Pro Hac Vice* Pending)
    Tex. Bar No.  00795976
    Ryan V. Caughey (*Pro Hac Vice* Pending)
    Tex. Bar No. 24080827
    SUSMAN GODFREY L.L.P.
    1000 Louisiana, Suite 5100
    Houston, Texas 77002-5096
    Telephone: (713) 651-9366
    Facsimile: (713) 654-6666
    nmanne@SusmanGodfrey.com
    vbhatia@SumanGodfrey.com
    rcaughey@SusmanGodfrey.com

    *Attorneys for Plaintiffs*